**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

**JOUREY NEWELL**                               **Case No. 2:25-cv-01018-GJP**

     Plaintiff,

v.

**LENDVIA LLC,**

     Defendant.

_____/

**PLAINTIFF'S OPPOSITION TO THE**
**DEFENDANT'S MOTION TO COMPEL ARBITRATION**

i

**Table of Contents**

I.    Introduction ........................................................................................................... 1

II.   Background .......................................................................................................... 1

III.  Legal Standard .................................................................................................... 3

IV.   Argument ............................................................................................................. 4

    A.  The evidence adduced in visited the website and thus never agreed to arbitrate his claims. 4

    B.  A dispute exists as to what the UpFinances website said, as an independent website archive contradicts the terms Defendant claims and shows there was no arbitration provision, let alone one that names the Defendant. ................................................................. 12

    C.  A dispute exists as to what the operative agreement to arbitrate was. Even if agreed to between Mr. Newell and LendVia, any one of them is legally defective, which forecloses on the arbitrability of the Plaintiff's claims. ...................................................... 21

V.    CONCLUSION ................................................................................................... 25

**Table of Authorities**

**Cases**

*Arnaud v. Doctor's Assocs. Inc.*, 821 F. App'x 54 (2d Cir. 2020) ................................ 24

*Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325 (11th Cir. 2016) ................... 13

*Berman v. Freedom Financial Network, LLC*, 30 F.4th, 849 (9th Cir. 2022) .............. 24

*Booth v. BMO Harris Bank, N.A.*, No. CIV.A. 13-5968, 2014 WL 3952945 (E.D. Pa. Aug. 11, 2014) ...................................................................................................................... 18

*Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513 (3d Cir. 2009) ... 3

*Coinbase, Inc. v. Suski*, 602 U.S. 143 (2024) ....................................................... 13, 14

*Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728 (N.D. Cal. 2019) ........................... 24

*Conrad v. Camping World Holdings Inc.*, No. 4:24-CV-171-CLM, 2025 WL 66689 (N.D. Ala. Jan. 9, 2025) .............................................................................................................. 11, 12

*Cullinane v. Uber Techs., Inc.*, 893 F.3d 53 (1st Cir. 2018) ....................................... 20

*First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938 (1995) ....................................... 20

*Fuller v. Guthrie*, 565 F.2d 259 (2d Cir. 1977) ........................................................ 19

*Gilliam v. Prince Health Grp. LLC*, No. 1:24-CV-00033, 2025 WL 1126545 (M.D. Tenn. Apr. 16, 2025) .................................................................................................................... 11

*Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1 (1st Cir. 2014) ................ 13

*Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010) ............................ 18

*Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764 (3d Cir. 2013) ............ 2, 3, 4, 8

*Hobbs v. Apollo Interactive, Inc.*, No. 4:19-CV-57 (CDL), 2019 WL 6878863 (M.D. Ga. Dec. 17, 2019).................................................................................................................................... 10

*Howsam v. Dean Witter Reynolds*, 537 U.S. 79 (2002)................................................................ 18

*Interocean Shipping Co. v. National Shipping & Trading Corp.*, 462 F.2d 673 (2d Cir. 1972) .... 4

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156 (3d Cir. 2009) ................................ 3

*Lamps Plus, Inc. v. Varela*, 587 U.S. 176 (2019) ........................................................................ 4

*Larson v. Harman Mgmt. Corp.,* No. 1:16-cv-00219-DAD-SKO, 2016 U.S. Dist. LEXIS 149267 (E.D. Cal. Oct. 26, 2016)............................................................................................................ 21

*Mantha v. QuoteWozard.com, LLC*, No. CV 19-12235-LTS, 2021 WL 6061919 (D. Mass. Dec. 13, 2021).................................................................................................................................... 23

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985) ........................ 5

*Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63 (2010) .................................................................. 14

*Robert D. Mabe, Inc. v. OptumRX*, 43 F.4th 307 (3d Cir. 2022) ................................................ 4

*Ross v. McMillan*, 93 A.2d 874 (Pa. Super. 1953)...................................................................... 19

*Schuchmann v. Great Am. Power LLC*, No. 3:23-CV-1604, 2024 WL 219267 (M.D. Pa. Jan. 19, 2024)........................................................................................................................................ 25

*Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17 (2d Cir. 2002) .............................................. 24

*Starling v. OnProcess Tech., Inc.*, No. 1:23-CV-10949-JEK, 2024 WL 1258501 (D. Mass. Mar. 25, 2024), *appeal dismissed sub nom. Starling v. AT&T Servs., Inc.*, No. 24-1341, 2024 WL 4542099 (1st Cir. Sept. 19, 2024) ...................................................................................... 17, 21

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010)............................................ 4

*Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468 (1989) .............................................................................................................................. 13

*Walker v. Nautilus, Inc.*, 541 F. Supp. 3d 836 (S.D. Ohio 2021) ................................................ 25

*Woodard v. SmartMatch Ins. Agency, LLC*, No. 23 CV 5246, 2024 WL 4252803 (N.D. Ill. Sept. 20, 2024).................................................................................................................................... 11

## Statutes

15 U.S.C. § 7001(c) ................................................................................................................... 22

15 U.S.C. § 7001(c), (c)(1). ....................................................................................................... 22

47 C.F.R. § 64.1200(a)(2) .......................................................................................................... 22

47 C.F.R. § 64.1200(c)(2) .......................................................................................................... 22

47 C.F.R. § 64.1200(f)(8) ........................................................................................................... 21

47 U.S.C. § 227 ............................................................................................................................ 1

54 Pa. Cons. Stat. § 331 ...................................................................................................... 19, 20

9 U.S.C. § 1 .................................................................................................................................. 3

9 U.S.C. § 4.......................................................................................................................... 3, 5, 14

**Other Authorities**

Delcaration of Jourey Newell (Newell Dec.)............................................................................ 8, 9

*In re Rules & Regs,* 27 FCC Rcd. 1830 (2012) .................................................... 21, 22

*Terms of Use*, UPFINANCES (INTERNET ARCHIVE) ........................................................ 15

I.    Introduction

Despite the limited arbitration discovery period ordered by this Court, Defendant

LendVia has not been able to adduce a scintilla of evidence tending to show that the *Plaintiff*,

Mr. Newell, ever visited the UpFinances website or ever submitted any of his information on it.

As Mr. Newell's renewed declaration makes clear, Mr. Newell did not visit the UpFinances

website, nor agree to arbitrate his claims against LendVia. Moreover, the discovery adduced in

this matter, including the subpoena propounded on AT&T, the provider for the Chambersburg,

Pennsylvania IP address at issue, confirms that *AT&T has no records pertaining to that IP*

*address*. This is not to mention that none of the other information from the alleged website visit

is accurate, including Mr. Newell being anywhere near Chambersburg. As such, this disputed

factual evidence mandates a summary arbitration jury trial as provided for under the FAA.

But even though the Plaintiff is entitled to a summary arbitration trial, this Court should

deny the Defendant's motion to compel outright because even *if* someone submitted information

to the UpFinances website, the points elucidated to in the Plaintiff's original opposition remain

true. None of the evidence adduces shows that Defendant LendVia was direct or indirect

beneficiary of any purported arbitration agreement as alleged between Utel USA LLC and

Plaintiff, and the agreement to arbitrate is not sufficiently conspicuous and thus is unenforceable.

Moreover, the additional discovery period has revealed additional discrepancies shedding doubt

on the actual terms and conditions which were present on the UpFinances website.

II.    Background

This case involves highly-illegal prerecorded telemarketing calls made in plain violation

of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq*. (hereinafter referred to as

the "TCPA") by the Defendant LendVia LLC to market its financial services offerings.

1

Defendant LendVia seeks to avoid this lawsuit by compelling arbitration based on putative "Terms of Use" purportedly appearing on a website to which the Plaintiff is alleged to have submitted his personal information and allegedly consented to receive calls.

This Court denied LendVia's original motion without prejudice to permit a limited discovery period aimed at ascertaining whether the parties agreed to arbitrate their dispute. The discovery adduced through this period simply confirms that disputed facts exist as to whether Mr. Newell agreed to contract with LendVia, let alone anyone at all, and thus agreed to arbitrate, which mandates a summary jury trial under the Federal Arbitration Act. *Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 780 (3d Cir. 2013). Among other evidence adduced in the limited discovery period, AT&T has confirmed that it has no records pertaining to the IP address at issue, which is not Mr. Newell's IP address, as Mr. Newell uses Verizon, not AT&T, for his internet services. The email address allegedly submitted to the website is not his. And though the date of birth and social security number is accurate, as Mr. Newell makes clear, this information is out there as the result of a data breach, and has further been used to commit identity theft, including to sign up for electric services in Texas. As such, the Plaintiff's declaration renders the Defendant's contentions incontrovertibly false. In sum, Plaintiff had no knowledge of, never agreed to, and would never agree to, arbitrate his claims against Defendant.

The further supplementary materials Defendant has submitted show, at minimum, that there exist disputed factual questions as to whether the parties agreed to arbitrate. Despite finally identifying the website operator, Defendant still relies on flimsy evidence and disputed, controverted declarations, which simply consist of conclusory statements that the Plaintiff visited the subject website and submitted his information. To the contrary, Defendant has not produced a single piece of evidence affirmatively linking the Plaintiff himself to the website visit and the

2

subject arbitration clause. To the contrary, the alleged "video" Defendant had of the Plaintiff is nothing more than a glorified video recreating the information that was allegedly submitted to the website. It doesn't show *who* submitted that information; to the contrary, AT&T has no record of any information pertaining to the IP address associated with the website visit.

III.    Legal Standard

In evaluating a motion to compel arbitration in a TCPA case, the Federal Arbitration Act ('FAA'), 9 U.S.C. § 1 *et seq*., governs the enforceability of an arbitration agreement. That statute commands that before compelling arbitration of a dispute, the Court must first be satisfied that the parties agreed to arbitrate that dispute. 9 U.S.C. § 4 (directing that courts must direct the parties to arbitration "upon being satisfied that the making of the agreement for arbitration . . . is not in issue"); *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 532 (3d Cir. 2009). Once an enforceable agreement has been established, the court must then turn to whether the particular dispute factually and legally falls within the scope of the agreement. *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160, 163 (3d Cir. 2009).

Courts in the Third Circuit employ a two-standard inquiry when determining whether an enforceable agreement to arbitrate formed when deciding a motion to compel arbitration under the FAA. In evaluating whether to apply the Rule 56 standard or Rule 12(b)(6) standard, the court looks to whether the motion to compel has as a predicate the "requisite clarity to establish on its face that the parties agreed to arbitrate, or the opposing party has come forth with reliable evidence that is more than a naked assertion that it did not intend to be bound by the arbitration agreement, even though on the face of the pleadings it appears that it did." *Guidotti*, 716 F.3d at 774. If it does, and the opposing party has produced no evidence to the contrary, the Rule 12(b)(6) standard is appropriate. *Id.*

3

Where, instead, *either* "the motion to compel arbitration does not have as its predicate a complaint with the requisite clarity" to determine that a valid agreement to arbitrate was formed, *or* the party opposing the motion has come forth with evidence beyond a "naked assertion . . . that it did not intend to be bound" by such an agreement "to place the question in issue", the motion must be decided under the standard applicable to motions for summary judgment under Rule 56. *Id.* Under that standard, "An unequivocal denial that" the parties agreed to arbitrate, "accompanied by supporting affidavits," is sufficient to require jury determination on whether the parties agreed to arbitrate. *Id.* (ultimately citing *Interocean Shipping Co. v. National Shipping & Trading Corp.*, 462 F.2d 673, 676 (2d Cir. 1972)). Here, both parties have been afforded an opportunity to develop the factual record relevant to the motion through formal discovery, and disputed questions remain, so the Plaintiff is entitled to a jury trial on the issue of whether he agreed to arbitrate. *Robert D. Mabe, Inc. v. OptumRX*, 43 F.4th 307, 329–30 (3d Cir. 2022).

IV.    Argument

A.  *The evidence adduced in visited the website and thus never agreed to arbitrate his claims.*

"Arbitration is a matter of consent, not coercion." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 664 (2010). The Supreme Court has held time and time again that, despite the liberal policy favoring arbitration, "consent" remains a "first principle that underscores" all arbitration decisions. *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 184 (2019). Consent is essential under the FAA because arbitrators wield only the authority they are given. *Id.* As the party seeking to arbitrate, the Defendant bears the burden of demonstrating, at the same level as at summary judgment, not only that a valid arbitration agreement exists but also that the *Plaintiff himself* agreed to be bound by the clause of which he had adequate legal notice. *Robert D. Mabe, Inc.*, 43 F.4th at 329 ("Because it is plausible that a number of the pharmacies were never given

4

the terms of their Provider Agreements, it is likewise plausible that holding the pharmacies to the arbitration agreements contained therein would be procedurally unconscionable."). Despite being given the opportunity to do so through the limited discovery period ordered by the Court, Defendant has failed to meet its burden, and thus, a summary arbitration jury trial is warranted.

The Federal Arbitration Act commands that, before compelling arbitration of a dispute, the Court must first be satisfied that the parties agreed to arbitrate that dispute. 9 U.S.C. § 4 (directing that courts must direct the parties to arbitration "upon being satisfied that the making of the agreement for arbitration . . . is not in issue"); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) ("[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute."). And, "[i]f the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. The contract formation itself is called into issue.

The Defendant is not entitled to invoke any arbitration clause against Mr. Newell because the factual question of whether the Plaintiff even agreed as a matter of contract remains called into issue. Several pieces of evidence developed through the arbitration discovery period dictate this conclusion. First, the Plaintiff's declaration makes it unequivocally clear that he did not visit the UpFinances website, did not agree to arbitrate any disputes, and would not have. Plaintiff's discovery responses confirm these contentions. Second, the Plaintiff served a subpoena on AT&T, the provider for the IP address alleged to have visited the UpFinances website. However, the response, attached herein as Exhibit A, makes clear that AT&T has no information about the subscriber of record for that IP address, leading to the conclusion that the IP address was simply fabricated by Defendant or Utel and never assigned to *anyone*, let alone the Plaintiff. Finally, none of the purported information matches the Plaintiff's information, including the email

address and the fact that the alleged website visit originated from Chambersburg, Pennsylvania, almost 150 miles from King of Prussia, and a place that the Plaintiff was nowhere near on the day in question.

On face, therefore, even putting aside the Plaintiff's own declaration and evidence, there exist actual issues with the evidence proffered by the Defendant. Despite having the opportunity to affirmatively prove that Mr. Newell himself visited the website and submitted his information in discovery, Defendant simply again repeatedly asserts threadbare, conclusory statements like the one that the "Plaintiff clearly and knowingly agreed to resolve any disputes through individual arbitration," without production of any evidence showing that this is the case. As Mr. Newell's declaration makes clear, that assertion is manifestly untrue, and, even after discovery, Defendant has not advanced a *scintilla* of evidence showing that the Plaintiff *himself* submitted any information to Utel, who operates the UpFinances website, let alone LendVia itself. Indeed, the evidence here shows the *opposite*: AT&T (which the Plaintiff does not even use) has no information pertaining to the IP address that allegedly submitted the opt in, none of the facts in the purported opt-in add up, and the Defendant's purported "video" *does not show the Plaintiff's face*, or any face *at all*. Rather, it is simply a visual recreation of the information allegedly submitted to the website, from an AT&T IP address that AT&T has no record of any information about. Indeed, no reasonable juror could find that Plaintiff visited the site without a valid IP assignment linking to him. Defendant has not met its burden under the FAA at this stage.

Defendant was required to develop evidence sufficient to meet its burden under the summary judgment standard that the Plaintiff *himself* agreed to arbitrate his claims. Despite submitting three conclusory declarations, Defendant has been unable to do so, warranting outright denial or a summary arbitration trial to allow a jury to determine this disputed factual

issue. That a website visit may have occurred, which itself is a questionable proposition given that AT&T has no records pertaining to the IP address, is not proof that the Plaintiff *himself* visited the website or agreed to any of its terms. Critically, the purported "screen recording" did not capture the *Plaintiff* doing anything–all it does is simply recreates what was allegedly submitted on a website. It does not demonstrate whether the purported website submission was made by the Plaintiff, Bob down the street, or a robot. The Verified Consent platform simply works by recording keystrokes and can be generated without a user actually being on the site at all. This is not to mention the fact that Defendant has not adduced any biometric or other information traceable to Plaintiff, let alone an actual contemporaneous screen capture, which undermines the authenticity of the purported "recording" and renders it of no evidentiary value.

This is particularly problematic given that the Plaintiff's identity has been recently compromised. This, coupled with AT&T's assertion that it has no records of having assigned the IP address to a customer, lends substantial credence to a much more plausible alternative theory: that Utel sold the Plaintiff's stolen personal information to LendVia. Simply put, LendVia cannot compel arbitration based on what is, at best, disputed circumstantial evidence. Indeed, even the Defendant's *own evidence* of the purported "verified consent" replay does *not* show that the Plaintiff (or anyone else) ever reviewed or linked the links for the "Privacy Policy" or "Terms of Use," as it claims in its motion, and it is not even clear what (if anything) was submitted.

This is not to mention that the only putative concrete evidence that would tend to link the Plaintiff to the website visit, the IP address, cannot and could not be the Plaintiff's. The Plaintiff does not have AT&T internet service. He never did. He was not anywhere near Chambersburg, Pennsylvania, the geolocation of the purported IP address. AT&T has confirmed it has no records pertaining to that IP address, including records outlining the customer to which it was

7

assigned. That is not to mention the fact that the purported website submission record does not match the screen resolution of the Plaintiff's telephone, either. As such, although Plaintiff respectfully submits that this issue should be decided in his favor, given the aforementioned issues, the Defendant certainly has not met its burden here, as at summary judgment, that there is no material factual dispute that the IP address is the Plaintiff's. To the contrary, the IP address is indisputably *not* the Plaintiff's, and thus, at least a factual dispute exists, if not an outright undisputed conclusion that the IP address is not the Plaintiff's. That warrants denial outright.

The Plaintiff's own revised declaration belies the viability of the Defendant's own motion, further necessitating denial outright or a summary trial. The Plaintiff himself independently verifies that he did not visit the website, had nothing to do with the visit, and thus did not agree to arbitrate anything. (Newell Dec. ¶ 11, 13, 14). The IP address is not the Plaintiff's, no record exists of it having been assigned to the Plaintiff, and geolocates to a location more than 150 miles away from where the Plaintiff was on the purported day of contracting (Newell Dec. ¶ 20, 21, 22, 19). The email address allegedly submitted to the website is inaccurate. (Newell Dec. ¶ 23). And, for that matter, although the date of birth and social security number are accurate, they were recently the subject of a data breach, and the Plaintiff has actually had his identity stolen with that very same information, including to open electricity service in Texas. (Newell Dec. ¶ 24). As Mr. Newell makes clear, these factual inconsistencies, together with his unequivocal denial of having agreed to arbitrate, (Newell Dec. ¶ 25), at the very least entitle Plaintiff to a jury trial on the issue of whether Plaintiff agreed to arbitrate anything.

In this respect, the facts of *Guidotti* are particularly noteworthy. 716 F.3d at 780. There, the Third Circuit reversed the grant of summary judgment *to the Plaintiff*, when the Plaintiff submitted a sworn declaration that they did not agree to arbitrate any claims and that they only

received notice of an arbitration provision based on a contract they admittedly entered into after the fact. In reversing, the Third Circuit held that, as here, the district court should have permitted further discovery and then "If, after presentation of the evidence uncovered during discovery, a genuine dispute of material fact remained, the Court then should have submitted to a jury (if either party demanded one) the factual question of whether Guidotti was aware of the arbitration clause in the Account Agreement at the time she signed and submitted the SPAA." *Id.*

Despite having the opportunity to develop, and developing, no further evidence that the Plaintiff himself submitted any information to UpFinances or LendVia, let alone agreed to arbitrate, Defendant's motion simply repeats the false and conclusory assertion that the "Plaintiff" submitted information to the UpFinances website, a website that it does not even own, operate, or control, but is rather operated by a lead generator, Utel, that has every incentive to sell as many leads as possible, including those with fabricated evidence. These facts render summary judgment for Plaintiff appropriate. The Plaintiff's own declaration demonstrates that the Defendant's allegations in this regard have no legs and are incontrovertibly false, warranting denial of the motion entirely, or at the very least a summary arbitration jury trial. (Newell Dec.). Not only does the Plaintiff categorically deny each element of the Defendant's theory, Mr. Newell's declaration also makes clear that a trial is necessary to decide on the disputed factual inconsistencies developed in discovery. (Newell Dec. ¶ 17-24). Indeed, AT&T's own subpoena response all but confirms that Defendant's contentions are false. (Newell Dec. ¶ 22).

At least two parallel court decisions dictate that the Defendant's motion ought to be denied on the basis of the Plaintiff's declaration *alone*, including the additional evidence, including the critical AT&T evidence, that the Plaintiff adduced in discovery, under the Rule 56 standard. The Middle District of Georgia's decision in *Hobbs v. Apollo Interactive, Inc.*, No.

9

4:19-CV-57 (CDL), 2019 WL 6878863 (M.D. Ga. Dec. 17, 2019), is particularly instructive.

There, a TCPA defendant sought to compel the plaintiff's claims to arbitration by contending,

like Defendant here, that the plaintiff agreed to an arbitration provision as a result of his visits to

the defendant's website. In finding no agreement to arbitrate existed, the court explained:

> Plaintiff presented evidence that he "did not visit www.bestautoinsurance.com" and that
> it would have been impossible for him to access the website in the manner Defendant
> says he did. According to Plaintiff, at 3:57 p.m. on August 29, 2018, Plaintiff was driving
> from a job at the Atlanta Zoo in southeast Atlanta, Georgia to Columbus, Georgia
> (southwest of Atlanta) and thus could not have been in Norcross, Georgia (northeast of
> Atlanta). Plaintiff also presented evidence that he does not own a device that uses the
> Windows 7 operating system; he uses his cellular telephone for internet access. Finally,
> Plaintiff stated that he "cannot know for certain who accessed" Defendant's website and
> input his information, but "[w]hat [he] do[es] know for certain is that [he] did not visit
> www.bestautoinsurance.com." From this, a reasonable factfinder could determine that
> Plaintiff did not enter his personal information on Defendant's website or click "submit."
> So, a reasonable factfinder could conclude that Plaintiff did not assent to the website's
> terms, including the arbitration provision. Accordingly, there is a genuine fact dispute as
> to whether Plaintiff entered an arbitration agreement with Defendant, and the Court thus
> cannot conclude as a matter of law at this stage in the proceedings that the parties had a
> valid agreement to arbitrate. For this reason, Defendant's motion to dismiss in favor of
> arbitration is denied.

*Id.* at *1-*2 (cleaned up). So too here. As an initial matter, the Defendant has simply moved to

dismiss or stay in favor of arbitration, which simply warrants denying the instant motion

outright. But, on the factual record here, just as in *Hobbs*, there are serious factual disputes as to

whether the website visit occurred at all, and even more problematically, whether the Plaintiff

ever visited the website or submitted any information to it. Like in that case, the Plaintiff was

physically present in King of Prussia, which is almost 150 miles from Chambersburg.

Additionally, the Plaintiff does not use AT&T for internet access, the email address is not his,

and the other information, including the screen resolution of the device that allegedly visited the

website, does not match the Plaintiff's, either. Accordingly, no reasonable factfinder could

conclude that the Plaintiff visited the website or agreed to arbitrate anything.

The *Hobbs* case is one of several in a long line of cases either denying such motions outright or ultimately concluding that a summary arbitration trial was necessary. *E.g.*, *Gilliam v. Prince Health Grp. LLC*, No. 1:24-CV-00033, 2025 WL 1126545, at *4 (M.D. Tenn. Apr. 16, 2025) ("[O]ther than the fact that Plaintiff's name and phone number were used, Prince Health offers no evidence that Plaintiff was the person who entered the information."); *Woodard v. SmartMatch Ins. Agency, LLC*, No. 23 CV 5246, 2024 WL 4252803, at *3 (N.D. Ill. Sept. 20, 2024). The Court in *Conrad v. Camping World Holdings Inc.* reached a similar conclusion, reasoning that the factual question of whether or not the plaintiff opted in to receive text messages from the defendant on a website containing an arbitration provision was put at issue and denied a similar motion to compel arbitration. No. 4:24-CV-171-CLM, 2025 WL 66689, at *2 (N.D. Ala. Jan. 9, 2025). There, the court first agreed that its decision "as to whether an arbitration agreement exists is simply a matter of contract," and that when a party does not "sign or otherwise enter the contract, he cannot be bound by its terms." *Id.* The court noted that the defendant provided no evidence to controvert the plaintiff's declaration, as here, that he did not agree to arbitrate any claims because he did not own the telephone number at issue at the time of the alleged opt-in, and thus that the defendant could not "show the parties had a meeting of the minds about arbitrating claims related to the CWH text message service." *Id.*

Though Defendant elucidates for pages as to the enforceability of clickwrap agreements, all the authorities cited by the Defendant take for granted the fundamental proposition that the parties agreed to contract, in some manner, as an initial matter. That is plainly not the case here. To be clear, although the Plaintiff also argues that the terms of the arbitration agreement are not enforceable as they are because they are contrary to law, Section C, *infra*, here, the Plaintiff

11

disputes the basic elements of contract formation as an initial matter. There can be no meeting of the minds if one party simply did not agree to contract as an initial matter, which is exactly the case here: there is no acceptance to any contractual term, by signature, clickwrap, or otherwise, by the Plaintiff, who never visited the website or submitted his information.

Accordingly, because Defendant's motion to compel lacks sufficient evidence to permit it to be granted on the summary judgment standard even after discovery, this Court should either deny the motion or move forward with scheduling a summary jury trial. Defendant still has been unable to meet its burden of demonstrating even a genuine issue entitling the Plaintiff to wholesale denial of the motion under the applicable summary judgment standard. The court in *Conrad* did the same, holding as a matter of law that the defendant did not meet its burden of demonstrating a disputed factual issue with respect to the claimed provision to justify an arbitration trial. *Id.* And because the Plaintiff agreed to nothing, he did not agree to any incorporated class waiver or arbitrability provision. Being that there is demonstrably no meeting of the minds as an initial matter, the Defendant's motion is due to be denied as a matter of law or alternatively proceed to an arbitration trial.

B. *A dispute exists as to what the UpFinances website said, as an independent website archive contradicts the terms Defendant claims and shows there was no arbitration provision, let alone one that names the Defendant.*

In Plaintiff's original motion, the Plaintiff observed that, by its plain terms and very text, the arbitration provision on the UpFinances website applied to any purported agreement between the website visitor and the mysterious "upfinances.com," which is a website, and not even a legal entity or company, and did not mention LendVia at all. As such, the Plaintiff argued that LendVia, as a noncontracting, nonsignatory party, was not entitled to enforce any arbitration agreement as between (allegedly) the Plaitniff and UpFinancies, which has since been revealed

to be run by Utel. In response, Defendant has produced as Exhibit B a copy of the Terms of Use that were purportedly in effect at the time of the alleged contracting. As Plaintiff will address below, this Court should have serious concerns with these terms, which an independent third party confirms *did not appear on the UpFinances website* in the form presented to the Court and *did not even contain an arbitration provision*, or name LendVia at all, including through its references to specifically defined terms, either.

The legal issue of whether an agreement can be said to extend to LendVia is one that the Supreme Court has made clear that this Court retains the ability to decide, as well. The question of whether an arbitration agreement formed as a matter of law, as here, between Plaintiff and LendVia is *not* reserved to the arbitrator, even with a purported delegation provision (in what appears to be a document of questionable veracity), as here. While the FAA creates a "presumption of arbitrability" such that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," "the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made." *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016). Consistent with the "general proposition" that "a contract cannot bind a non-party," *Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 9 (1st Cir. 2014), "the FAA does not require parties to arbitrate when they have not agreed to do so," *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989).

The Supreme Court recently addressed the proper procedure to follow when conflicts arise as to the enforceability of arbitration contracts, such as when one of the contracts is facially subject to an arbitration provision and one which is not. *Coinbase, Inc. v. Suski*, 602 U.S. 143, 143 (2024). The Supreme Court held that the first question in any arbitration dispute must be

13

what the parties agreed to. *Id.* at 145. The Supreme Court clarified that *this* "fundamental" question is one for the *Court*, not the arbitrator, to decide, and is driven by contractual interpretation principles under state contract law. *Id.* In *Coinbase*, the Supreme Court reaffirmed that "where, as here, a challenge applies "equally" to the whole contract and to an arbitration or delegation provision, a *court* must address that challenge." *Id.* at 151 (*quoting Rent-A-Ctr., W., Inc. v. Jackson,* 561 U.S. 63, 71 (2010)). The Court went on to explain that in such cases, just like here, "basic principles of contract and consent require that result. Arbitration and delegation agreements are simply contracts, and, normally, if a party says that a contract is invalid, the court must address that argument before deciding the merits of the contract dispute." *Id.* (quoting *Rent-A-Ctr.*, 561 U.S. at 71 for the proposition that "If a party challenges the validity . . . of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that [arbitration] agreement."). And the explicit text of Section 4 makes it clear that contract formation is a *jury* issue to the extent it does not rest on solely legal grounds, "upon such demand the court shall . . . specially call a jury for that purpose. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed." 9 U.S.C. § 4.

The discovery Defendant has adduced in Exhibit B as to the terms of the UpFinances website further demonstrates that there exists a factual dispute as to what that website even contained at the time of the purported website submission, including whether that website contained an arbitration provision *at all*. Defendant's motion states that "The Website's Terms of Use were in effect as of January 1, 2023, and remained in place at the time Plaintiff visited the site on December 8, 2024." (Mot. p. 9). This is a particularly curious assertion. Plaintiff's counsel has queried the Internet Archive's Wayback Machine, as attached herein as Plaintiff's

14

Exhibit B, and the alleged "Terms of Use" that were allegedly applicable at that time, on

November 9, 2024, do not even contain an arbitration provision *at all*. As the Third Circuit has

explained, "The Wayback Machine seeks to catalogue all websites on the internet and currently

has a database spanning more than a decade." *United States v. Bansal*, 663 F.3d 634, 667 (3d

Cir. 2011). However, reviewing the "Terms of Use" on the UpFinances website on November 9,

2024, does not reveal *any* arbitration provision on the website, nor does it list LendVia at all.

*Terms of Use*, UPFINANCES (INTERNET ARCHIVE) Nov. 9, 2024,

https://web.archive.org/web/20241109062603/https://upfinances.com/page/terms-of-use. Indeed,

its only reference to arbitration states in the introduction that the Terms of Use contain such a

provision, but otherwise does not reference arbitration, or LendVia, at all. It was not until

January of 2025 that an arbitration clause appeared on the website, and in any event, was

different than the version that the Defendant has proffered.

      Thus, the alleged agreement and corresponding arbitration provision, which is dated July

1, 2024, Def's Ex. B., in addition to internally contradicting Defendant's and Utel's own

declaration that the "arbitration disclosure . . . has been in effect on the Website since at least

January 1, 2023," Def's Ex. F., also is manifestly contradicted by the Internet Archive's own

independent screenshot of the Terms of Use, which doesn't even include an arbitration clause,

nor does it include LendVia. It is unclear where Exhibit B originated from, but it plainly did not

originate from the UpFinances website, particularly because the language the Internet Archive

has captured is different than Exhibit B submitted to the Court. Nor does the language presented

to the Court as Exhibit B appear to have ever existed on the UpFinances website, based on a

comprehensive review of all twelve captures of the Terms of Use on the UpFinances website

from August 2023 to present. *Changes – Terms of Use*, UPFINANCES,

https://web.archive.org/web/20250000000000*/https://upfinances.com/page/terms-of-use.

Strangely enough, the Terms of Use currently effective on the website as of January 20, 2025, and *currently available on the website for the Court to review to this day* do not mention LendVia or define the terms "we", "our", or "us," in the same manner. Defendant's Exhibit B, therefore, is of questionable veracity, particularly insofar as the Internet Archive shows a manifestly different version of the Terms of Use as an initial matter, and further insofar as the exhibit proffered by the Defendant appears to directly address one of the Plaintiff's arguments in the original motion, repeated here, that LendVia is not entitled to enforce the agreement because it is not a contracting party. Indeed, it appears to have been drafted to address the very argument the Plaintiff made in his original motion, as here, that LendVia cannot enforce the purported arbitration agreement because it isn't even a signatory or named in the agreement.

The very Terms of Use themselves, as reflected by the Internet Archive, plainly *concede* that they only are a "an agreement betweenupfinances.com ("Company", "Website", "Site", "we" or "us") and client." Thus, by its very terms, the agreement only is between the website visitor and upfinances.com, which isn't even a cognizable legal entity, but has been revealed to be Utel. Besides not even containing an arbitration clause at all, but only a vague passing reference to such a clause with no corresponding clause, and thus not constituting an agreement to arbitrate at all, the terms *also* do not include LendVia *at all*. At the very least, even to the extent that this Court were to consider Defendant's Exhibit B, a jury trial is still required to determine what the operative contractual language is, assuming that the jury held that the Plaintiff agreed to arbitrate as an initial matter. In any event, the point remains that the contractual language is plainly insufficient to allow the Defendant here, LendVia, to claim that it was a beneficiary of such an agreement. On this point, the case of *Starling v. OnProcess Tech.,*

16

*Inc.*, No. 1:23-CV-10949-JEK, 2024 WL 1258501, at *5 (D. Mass. Mar. 25, 2024), is instructive.

*appeal dismissed sub nom. Starling v. AT&T Servs., Inc.*, No. 24-1341, 2024 WL 4542999 (1st

Cir. Sept. 19, 2024).

        In *Starling*, the wireless company AT&T attempted to compel arbitration of a non-

signatory's claims against AT&T under the theory that the non-signatory had been listed as an

alternate point of contact for a signatory family member's AT&T account. There, the Court

rejected such a sweeping view of the subject arbitration agreement that purported to bind "all

authorized or unauthorized users or beneficiaries of the Service," as well as the parties'

"respective subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and

assigns," that AT&T argued rendered the non-signatory a beneficiary bound by the agreement.

*Starling*, 2024 WL 1258501, at *5. Unlike here, there, those terms were carefully and exactingly

defined. Nevertheless, the Court still refused to broaden the scope of the agreement. In reaching

that conclusion, the Court reasoned that a "TCPA claim is not a benefit of a contract for internet

service; it is an independent cause of action created by Congress in response to 'a torrent of

vociferous consumer complaints about intrusive robocalls' that could 'automatically dial a

telephone number and deliver an artificial or prerecorded voice message.'" *Id.* at *5–*6. That is

plainly the case here, and even more so when LendVia is nowhere mentioned in any of the

verifiable versions of the Terms of Use and only appears in Defendant's Exhibit B.

        Here, when reviewing the archived version of the Terms of Use, there is nothing in them

that requires the Plaintiff to arbitrate his claims, let alone those against LendVia, who isn't

mentioned by name in two of the agreements, and is conveniently referenced only in a disputed

agreement. The *only place* where LendVia is explicitly named as a contracting party is in the

Defendant's Exhibit B, which, as noted, is a disputed document of questionable authenticity as

the language there does not currently appear on the website, nor does it ever appear on the archived versions of the website. The rationale for the rule requiring any arbitration agreement to name the parties seeking to benefit from it is obvious. Without naming entities to a contract with sufficient specificity and exacting language, a contracting party could rely on any purported arbitration agreement between the parties to bind up family members and associates who could hardly be said to benefit from, let alone be aware of, such an agreement, and in so doing, sidestep the common law principle that the parties to a contract need capable of contracting.

The authorities cited by the Defendant are all inapposite, because those cases all dealt with explicitly-named third-party beneficiaries. For example, in *Booth*, the court held that a non-signatory, like a lending bank, could "can enforce an [arbitration] agreement when there is an obvious and close nexus between nonsignatories and the contract or the contract parties." *Booth v. BMO Harris Bank, N.A.*, No. CIV.A. 13-5968, 2014 WL 3952945, at *5 (E.D. Pa. Aug. 11, 2014). It so held because a "close relationship" existent between the Defendants and the parties to the Loan Agreements because the "Defendants' role in processing the debits and credits related to Plaintiff's loans was set out in the Loan Agreements, and Plaintiff agreed to arbitrate disputes with parties other than the Lender." *Id.* By contrast, here, even assuming that Defendant's Exhibit B were the operative agreement, the agreement does not even mention prerecorded telemarketing calls or that that the arbitration agreement was intended to cover the same. And even then, the scope of the arbitration provision is, at best, ambiguous, in that the agreement only addresses website disputes, not issues relating to illegal prerecorded calls.

Arbitration "is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 83 (2002); *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010)

18

(arbitration may be compelled "only where the court is satisfied that the parties agreed to arbitrate *that dispute*") (emphasis in original). This rule stems from the "first principle" that arbitration is "strictly a matter of consent," and thus "is a way to resolve those disputes—*but only those disputes*—that the parties have agreed to submit to arbitration." *Granite Rock*, 561 U.S. at 299 (emphasis in original). Though policy favors arbitration, "federal policy alone cannot be enough to extend the application of an arbitration clause far beyond its extended scope." *Fuller v. Guthrie*, 565 F.2d 259, 261 (2d Cir. 1977).

Here, the scope of the arbitration provision, which itself is disputed and will require a jury trial to determine the operative terms, by its plain text, may not have even included an arbitration clause at all, nor does it apply to the conduct at issue here, the TCPA violative illegal calls the Plaintiff received, or to the party at issue here, LendVia. Not even the version Defendant presents as Exhibit B does that. It only applies to a dispute with respect to "any aspect of our relationship or any contact between us, direct or indirect, or arising out of this or previous versions of these Terms, your use of or access to our Site or services, or any products or services sold, offered, or purchased through our Site or services." For that matter, not even the Defendant's agreement says anything about telemarketing calls, or even anything about marketing conduct generally.

Pennsylvania contract law also controls on this issue. The Pennsylvania Fictitious Names Act, 54 PA. CONS. STAT. § 331 was drafted "to protect persons giving credit in reliance on the fictitious name, and to definitely establish the identity of the individuals owning the business, for the information of those who might have dealings with the concern." *Ross v. McMillan,* 93 A.2d 874, 875 (Pa. Super. 1953). In other words, the Act prevents an entity from concealing its true identity from those parties with which it contracts or otherwise does

business. Neither "UpFinances," nor UpFinances.com" are registered as fictitious entities with the Commonwealth. The Act thus bars LendVia from moving to compel arbitration, unless a Jury determines that Exhibit B is the operative agreement and that it was not otherwise invalid under the Fictitious Names Act. Given that the agreement terms themselves remain in genuine dispute, particularly given the Internet Archive inconsistency, this Court should further reserve ruling on such issues until such time as the jury determines which operative agreement to apply.

In pertinent part, 54 PA. CONS. STAT. § 331(a) prohibits "any entity which has failed to register a fictitious name" from maintaining "any action in any tribunal of this Commonwealth." And, of particular relevance here with respect to LendVia, nor can any action be maintained by any "successor or assignee of such entity on any right, claim or demand arising out of a transaction with respect to which such entity used such fictitious name until such entity, or an entity which has acquired all or substantially all of its assets, shall have complied with the provisions of this chapter." *Id.* Even putting aside which version of the contract to apply for a moment, as simple matter of Pennsylvania law, LendVia is estopped from even *attempting* to compel any arbitration rights it may claim to be entitled, because UpFinances has not complied with the provisions requiring registration of its fictitious name under the provisions of Pennsylvania law as against a Pennsylvania resident. Pennsylvania law, therefore, bars the maintenance of "any action," including one to compel arbitration, absent correct corporate registration under the provisions of the Fictitious Names Act. As Defendant itself concedes, "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 61 (1st Cir. 2018) (*quoting First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

20

An arbitration agreement is to be interpreted on its plain terms; although it may incorporate entities by reference, it cannot be used to bind anyone and everyone associated with it. *Starling* 2024 WL 1258501, at *5. As a matter of public policy, as supported by well-established Pennsylvania law, therefore, none of the three potential agreements can extend to LendVia. Moreover, because the website did not obtain Plaintiff's consent for LendVia to make telemarketing calls as an initial matter, any purported arbitration language in the website's terms and conditions does not apply to TCPA disputes, nor could it, because TCPA consent rules require naming a *specific seller* on whose behalf consent is obtained. *See Larson v. Harman Mgmt. Corp.,* No. 1:16-cv-00219-DAD-SKO, 2016 U.S. Dist. LEXIS 149267, *5-7 (E.D. Cal. Oct. 26, 2016) (quoting 47 C.F.R. § 64.1200(f)(8)); *In re Rules & Regs,* 27 FCC Rcd. 1830, 1844 at ¶33 (2012) (holding that consent must include disclosure that the consumer is consenting to receive telemarketing calls *from a specific seller*). If there is no consent with respect to a specific seller who made the illegal telemarketing calls at issue here, there can be no dispute with respect to a specific seller for an arbitrator to arbitrate. Defendant's motion to compel should be denied.

C.  *A dispute exists as to what the operative agreement to arbitrate was. Even if agreed to between Mr. Newell and LendVia, any one of them is legally defective, which forecloses on the arbitrability of the Plaintiff's claims.*

The purported agreement to arbitrate based on alleged consent to contact the Plaintiff is legally defective because it fails to name the specific seller or goods being sold here, that is, LendVia's lending services, as LendVia appears *nowhere* on the UpFinances website, except in Defendant's own Exhibit B of questionable veracity, as well as in the purported "verified consent." But even those sources, assuming that they were the true and accurate versions of the documents to be presented, do not meet the TCPA's legal requirements for consent.

The arbitration agreement, and any corresponding consent obtained therefrom, is legally

21

deficient because it did not comply with the requirements of the Federal E-SIGN Act, 15 U.S.C. § 7001(c). The FCC's regulations implementing the TCPA require a *signed* writing. 47 C.F.R. § 64.1200(c)(2); 47 C.F.R. § 64.1200(a)(2). Of course, Plaintiff does not dispute it is possible to obtain electronic consent to arbitrate in lieu of a signed writing. But if it does, that TCPA consent, and any associated arbitration agreement, must comply with the requirements under the E-SIGN Act. 47 C.F.R. § 64.1200(f)(9) (defining prior express written consent and requirements for electronic signatures); *see In re Rules 2012* ¶ 34 ("[C]onsent obtained in compliance with the E-SIGN Act will satisfy the requirements of our revised rule, including permission obtained via an email, website form, text message, telephone keypress, or voice recording."). Consent obtained in accordance with the E-SIGN Act's requirements may be sufficient TPCA consent; consent obtained in in violation of those requirements is a legal nullity because it is unsigned. *Id.*

Here, Defendant has failed to adduce that any of the legal disclosures required by the Act were included in the websites or purported "Terms of Use" containing the purported arbitration agreement that Defendant identified. Indeed, even the purported "verified consent" website contains no evidence showing that the Plaintiff, as the purportedly contracting party, was ever provided the hardware or software requirements for access to and retention of electronic records. 15 U.S.C. § 7001(c)(1)(C)(i), (ii). Moreover, the website did not give any consumer a "statement" informing them of the procedures for granting or withdrawing consent, or *any* of the other required consumer disclosures, including the very consent to electronic records themselves. 15 U.S.C. § 7001(c), (c)(1). The E-SIGN Act requires these disclosures, and the failure to provide them is fatal to the enforcement of any electronically signed agreement.

A defendant lost a motion for summary judgment on substantively similar issue in *Mantha v. QuoteWozard.com, LLC*, No. CV 19-12235-LTS, 2021 WL 6061919, at *8 (D. Mass.

22

Dec. 13, 2021), based on a substantially similar agreement to that proffered here. In *Mantha*, the Court held that the consent to make calls purportedly obtained via a website was legally deficient because it did not meet the requirements of the E-SIGN Act. *Id.* As a result, in *Mantha*, the court entered partial summary judgment *on behalf of a plaintiff* on the issue of consent. *Id.* As the Court held in *Matha*, such a failure to obtain the required E-SIGN disclosures is fatal to compliance with the E-SIGN Act and therefore cannot constitute express written consent. *Id.* Relatedly, a failure to do so is also dispositive of the enforceability of the arbitration provision as no legally-binding contract formed as an initial matter, let alone one purporting to provide consent to receive robocalls or arbitrate this dispute. Therefore, even if the Court were to ignore Defendant's complete lack of evidence of Plaintiff's factual agreement to arbitrate, there is no basis to conclude that the purported agreement was legally sufficient and therefore there is no dispute as to consent, including factual issues of whether the Plaintiff consented to receive calls or not, for the arbitrator to arbitrate.

The current version of the website is so insufficiently specific enough to put a website visitor on notice that they are agreeing to an arbitration clause. A review of the current UpFinances website form reflects that there is a big, yellow "continue" button, and a series of 9 links, spread across two columns, followed by a bigger button that spans the width of the two columns, stating "Struggling to fill out this form?" This form on the website differs from the one the Plaintiff is alleged to have submitted, but it is not at all clear how the form changed from time to time, or whether the replay "verified consent" form version simply displays a simplified version, some other point in the process, or a different form entirely. In either case, the agreement doesn't give conspicuous notice.

The hallmark of the enforceability of a clickwrap agreement is the conspicuousness of its

notice. *See Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 30 (2d Cir. 2002). An offeree is "not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious." *Id.* As numerous courts have held, burying the purported arbitration agreement under the "Terms of Use" link on the page, which is the fourth link in the first column, as illustrated on the proceeding page, is a game of hide-and-seek insufficient to give notice of the fact this link, as opposed to any one of the other 8 links and two large buttons also on the page, contains an arbitration provision. *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 765 (N.D. Cal. 2019) ("Users cannot be reasonably expected to click on every word of the sentence in case one of them is actually a link."). And although the "verified consent" webpage reflects different language referring to the "Privacy Policy and Terms of Use, which includes binding arbitration," it does not appear from even that website "recording" that those terms were ever presented to a website user, or if this is some different point in the process.

In *Berman v. Freedom Financial Network, LLC*, the Ninth Circuit affirmed the denial of a motion to compel arbitration in a web form with far fewer maladies then here, but where the link had no "conspicuous notice" of the terms to which the consumer will be bound, nor did it "prominently display . . . proposed contractual terms," just like here. 30 F.4th, 849, 856–57 (9th Cir. 2022). This website in this case is remarkably similar, if not more problematic, than the one in *Arnaud v. Doctor's Assocs. Inc.*, 821 F. App'x 54, 56 (2d Cir. 2020), where the Second Circuit held that a disguised and cluttered link to terms and conditions was insufficient to give notice of a "clickwrap" arbitration provision. *Doctor's Assocs.* and *Berman* are two of many cases in the TCPA and consumer protection context where courts reject clickwrap agreements, particularly when their existence is buried, here among eight other links, or obscured, and when the arbitration clause appears approximately three quarters of the way down a pop up box.

24

Procedural and substantive conscionability is still a prerequisite to the enforcement of a clickwrap agreement, and such so-called "dark patterns" of hiding relevant contractual terms from consumers renders such clickwrap agreements unconscionable, and, by extension, unenforceable. Other courts have followed similar reasoning. *See, e.g.*, *Walker v. Nautilus, Inc.*, 541 F. Supp. 3d 836, 841 (S.D. Ohio 2021) (holding that due to the inconspicuous nature of the website's terms of use, plaintiff had neither actual nor constructive notice of arbitration provision and therefore could not assent to it). This makes this case similar to *Schuchmann v. Great Am. Power LLC*, where the Middle District denied a motion to compel arbitration in a TCPA case when "the record as developed so far does not indicate that Plaintiff had been informed of the arbitration clause," based on far less problematic website content than here. No. 3:23-CV-1604, 2024 WL 219267, at *4 (M.D. Pa. Jan. 19, 2024).

Because a dispute exists as to which version of the corresponding terms and conditions language was presented to Plaintiff, the Court should first hold the issue over for jury trial to determine the operative language. In either event, because the agreement to arbitrate does not was not legally sufficient for the purposes here of obtaining TCPA consent because the website did not comply with E-SIGN's requirements, and because the website did not provide conspicuous notice of the arbitration provision, the Court must also deny the Defendant's motion on independent legal grounds, even if the Court were to hold, *arguendo*, that the Plaintiff agreed to arbitrate something as a factual matter.

V.    CONCLUSION

For all of the foregoing reasons, the summary judgment standard applies and the record here compels denial of the motion outright as Defendant has not met its burden. Alternatively, this Court should order a summary jury trial on the foregoing issues.

Dated: August 11, 2025

/s/ Andrew Roman Perrong
Andrew Roman Perrong, Esq.
Perrong Law LLC
2657 Mount Carmel Avenue
Glenside, Pennsylvania 19038
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing via ECF on the below date, which will automatically

send a copy to all attorneys of record on the case.

August 11, 2025

/s/ Andrew Roman Perrong
Andrew Roman Perrong, Esq.
Perrong Law LLC
2657 Mount Carmel Avenue
Glenside, Pennsylvania 19038
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com